# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

JASON CARL SCHULLER,
Defendant and Appellant.

S272237

Third Appellate District
C087191

Nevada County Superior Court
F16000111

---

August 17, 2023

Justice Groban authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Jenkins, and Evans concurred.

Justice Liu filed a concurring opinion, in which Justice Evans concurred.

---

PEOPLE v. SCHULLER

S272237


Opinion of the Court by Groban, J.


California defines the crime of murder as the unlawful killing of a human being with malice aforethought. The prosecution here relied on a theory of express malice, which requires an intent to unlawfully kill. (See *People v. Lasko* (2000) 23 Cal.4th 101, 107 (*Lasko*); Pen. Code, § 188.) Under the doctrine of imperfect self-defense, however, "[i]f a person kills . . . in the unreasonable but good faith belief in having to act in self-defense, the belief negates what would otherwise be malice, and that person is guilty of voluntary manslaughter . . . , not murder." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116.) A defendant charged with murder is entitled to an instruction on imperfect self-defense when there is substantial evidence to support the theory. (See *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).)

In this case, the Court of Appeal found that the trial court erred in denying defendant's request for an instruction on imperfect self-defense. The court further concluded that the error was a matter of state law only, and thus subject to the "reasonable probability" standard for evaluating prejudice set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). The court explained, however, that even if it were to assume the instructional error was subject to the stricter "beyond a reasonable doubt" standard that applies to federal constitutional errors (see *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)), it would still find Schuller had suffered

1

no prejudice based on the "overwhelming evidence that [he] was not acting in any form of self-defense." (*People v. Schuller* (2021) 72 Cal.App.5th 221, 238 (*Schuller*).)

We granted review to decide the appropriate standard for evaluating prejudice in this context. We now hold that when the record contains substantial evidence of imperfect self-defense, the trial court's failure to instruct on that theory amounts to constitutional error and is thus subject to review under the federal *Chapman* standard. "A jury misinstruction that relieves the prosecution of its burden to prove an element of the crime — by either misdescribing the element or omitting it entirely — violates [the federal Constitution]." (*People v. Hendrix* (2022) 13 Cal.5th 933, 942 (*Hendrix*); see *People v. Wilkins* (2013) 56 Cal.4th 333, 349 (*Wilkins*) ["incomplete" or "misleading" instruction on element of the crime constitutes federal constitutional error].) When imperfect self-defense is at issue, the malice element of murder requires the People to show the absence of that circumstance beyond a reasonable doubt. (*People v. Rios* (2000) 23 Cal.4th 450, 463 (*Rios*).) Thus, when there is substantial evidence to support the theory, the failure to instruct on imperfect self-defense amounts to an incomplete instruction on an actual element of murder, namely malice. In the absence of such an instruction, jurors would have no reason to conclude they cannot find malice (and thus cannot return a verdict of murder) if they harbor a reasonable doubt as to whether the defendant acted in the actual, but unreasonable, belief in the need for self-defense. Because this form of misinstruction precludes the jury from making a finding on a factual issue that is necessary to establish the element of malice, it qualifies as federal error. (See *In re Winship* (1970) 397 U.S. 358, 364 (*Winship*) ["the Due Process Clause protects the

accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"]; *Neder v. United States* (1999) 527 U.S. 1, 10 (*Neder*) ["erroneous instruction [that] precludes the jury from making a finding on the *actual* element of the offense" amounts to constitutional error].)

We further hold that the Court of Appeal's harmless error analysis did not comport with the standards for evaluating prejudice required under *Chapman, supra*, 386 U.S. 18. As we recently clarified in *In re Lopez* (2023) 14 Cal.5th 562 (*Lopez*), that standard compels the reviewing court to reverse the conviction unless it concludes that no "rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the findings necessary to convict the defendant [absent the instructional error]." (*Id.* at p. 591.) Because the court's analysis indicates that it did not "fully appreciate[] the proper standard for harmlessness" (*id.* at p. 568), we reverse the judgment affirming Schuller's conviction and remand the matter with directions that the court reconsider whether the failure to instruct on imperfect self-defense was harmless beyond a reasonable doubt. (See *id.* at p. 592 [remanding question of prejudice where court's analysis showed it did not apply the standard that *Chapman* requires].)

## I.    BACKGROUND

The Nevada County District Attorney charged defendant Jason Schuller with the first degree murder of W.T. and further alleged that Schuller had personally used and discharged a

firearm causing death. (Pen. Code, §§ 187, 12022.53.)[1] Schuller pleaded not guilty by reason of insanity and the case proceeded to trial.

## A. Trial Court Proceedings

### 1. *Evidence at trial*

#### a. *Prosecution's case-in-chief*

Jesse McKenna, W.T.'s neighbor and close friend, testified that Schuller visited W.T. frequently and had temporarily lived at his residence. In early 2016, however, W.T. told McKenna that Schuller was no longer welcome at his home. On the night of March 20, 2016, McKenna returned from a dinner and was surprised to see Schuller's vehicle, a white Chrysler 300, parked outside of W.T.'s home. Shortly after McKenna entered his house, he heard multiple rounds of gunshots and then saw Schuller's car speed away from W.T.'s home.

As McKenna approached W.T.'s residence he saw W.T.'s daughter H.T., who lived in a second-floor unit directly above W.T., pacing in front of the window. McKenna knocked on H.T.'s door and asked her if she had heard gunshots. She said she was uncertain what she had heard, but that a noise had caused her apartment to rattle. McKenna then went downstairs to check on W.T. When he entered the residence, he saw "flames coming out of [the] house" and W.T.'s burning body lying on the floor. McKenna ran back to his house to retrieve a fire extinguisher. When he returned, H.T. had come down to her father's apartment. As McKenna tried to put out the fire, he noticed that all four burners of the gas stove had been opened and "turned on full bore without flames," like someone was trying to "blow

---

[1] All further statutory citations are to the Penal Code.

the place up." McKenna called 911 and provided a description of Schuller's car.

H.T. testified that Schuller had become friends with her father and started staying on his couch from time to time. On the night of March 20, 2016, she observed Schuller's car parked outside her father's apartment. Shortly thereafter, she heard a succession of sounds like metal hitting metal coming from the residence and then "a very loud sound that physically shook the house." She then observed Schuller's vehicle leaving the home at a high rate of speed. When H.T. entered the apartment, she observed smoke and her father's body lying on the ground surrounded by shell casings, with his dentures out of his mouth.

Shortly after Schuller was seen leaving W.T.'s residence, police began pursuing a white Chrysler 300 in the area. Schuller was driving the vehicle and refused to stop, resulting in a 38-mile high-speed pursuit that ended only after the vehicle's tires were punctured with strip spikes. The handgun used in the shooting of W.T. was found in the car.

Investigating officers testified that 13 shell casings were recovered from the area near W.T.'s body. A gun case, a gas can and a large knife were found on the kitchen table. Although there was significant blood spatter on the walls and floor, there was no blood on the knife. W.T.'s cell phone was found under the table with a bullet lodged in it. The apartment had sustained fire damage and smelled of gas. Nevada County Fire District Chief Jim Turner determined that gasoline had been poured on the body and ignited. An autopsy revealed W.T. had sustained nine gunshot wounds to the left side of his head, with five shots entering the "facial area" and four shots entering above his ear in the "cranial area." W.T.'s body also exhibited

significant burn injuries. According to the pathologist, the nature of the burn markings indicated W.T.'s body had been ignited after he was dead.

### b. *The defense's case*

Schuller testified that he met W.T. after moving from Nebraska to California in 2013. Over the next few years, Schuller lived with W.T. from time to time and visited him often.

In 2016, Schuller was injured in a car accident and began experiencing visions of his dead ancestors and a "beautiful light." He described the light as "a gift of god" and had heard voices telling him to be "careful who [he] share[d] the light with." Schuller stated that he believed he was sent to "pave the way for the second coming . . . of Christ" and that a battle was being fought with "Satan's army." In March of 2016, Schuller drove to Nebraska in response to voices directing him to perform an operation there. Schuller claimed that during his drive to Nebraska he was shot at and attacked with grenades but did not suffer any injuries.

While in Nebraska, Schuller visited his sister. She testified that Schuller seemed to be experiencing visual and auditory hallucinations at the time of the visit, telling her that people were "following him" and telling him to shut up. His sister also reported that Schuller appeared to be in fear for his life and was uncharacteristically aggressive.

Schuller eventually decided to drive back to California. One day before the killing of W.T., Nevada police officers stopped Schuller on suspicion of reckless driving. Schuller told the officers that three men were trying to attack him with needles. He further stated that "the entire police force and agencies of the world [we]re letting Satan" do something and

commented on the "fake light." At one point, an officer stepped on an aluminum strip that produced a popping noise, causing Schuller to believe a gunshot had been fired and that the officers were trying to hurt him. The officers eventually allowed Schuller to go, believing he was not a danger to himself or others.

Schuller testified that he arrived back in California on March 20 and went straight to W.T.'s house. After the two had shared several drinks, W.T. asked Schuller to get rid of a firearm that Schuller had stored at W.T.'s house. W.T. retrieved the gun and placed it in a case on the kitchen table, asking Schuller to take it with him when he left the next morning.

Schuller explained that he "ended up sharing the light with" W.T., who initially experienced "over-whelming joy." Later in the night, however, Schuller shared the light with W.T. again, but was unable to get the light back. Schuller testified that W.T. looked outside with a smile on his face and said, "See, I told you I could take it from him." W.T. then pulled a knife from a kitchen drawer and tried to "stab at [Schuller]."

Schuller grabbed the gun on the kitchen table and asked W.T. if he was "Lucifer," to which W.T. responded yes. Schuller stated that he then put the gun down and said, "Yeah, right, . . . . You're not Lucifer." As soon as Schuller set the gun down, W.T. "went for the gun and raised the knife." Schuller then picked the gun up again, took a step back, and "pulled the trigger." Schuller said he was "in fear for [his] life" because W.T. had a "big knife."

Schuller was uncertain whether he fired more than one shot but recalled the bullet hitting W.T. "right in the head and he went down to the ground. The knife . . . f[ell] out of his hand."

Schuller testified that W.T. then "pushed himself up off the ground," which "shocked" Schuller, causing him to "jump[] back" and "pull[ the trigger] four or five more times." Schuller could not recall how the knife got back on the table. When asked why he shot W.T. four or five more times, Schuller testified he was "scared" because W.T. had yelled "You f'd up" and was then able to "push himself up . . . off the ground . . . without hesitation."

After firing the second round of shots, Schuller retrieved W.T.'s cell phone and attempted to call 911. However, he was unable to unlock the phone, which kept ringing. Schuller then heard a loud gasp and saw W.T.'s dentures fly at him, which scared Schuller again, causing him to "pull the trigger three more times." Schuller continued trying to call 911 with W.T.'s phone, but the phone kept ringing so Schuller shot it several times. Schuller finally decided to leave the residence but felt "a hundred thousand demons [sweep] through" him. Schuller turned and saw a demon enter W.T.'s body. Schuller attempted to "kill the demon" by pouring gasoline on W.T.'s body and igniting it. Schuller then left the home to travel to Monterey.

On cross-examination, Schuller admitted that in his initial statements to the police he never claimed to have shot W.T. in self-defense because he "did not know who to trust." Instead, Schuller had told the police W.T. was gay and trying to come on to him.

### c. Prosecution's rebuttal witnesses

A detective testifying as a rebuttal witness for the prosecution explained that he had monitored calls Schuller made to friends and family from jail after his arrest. According to the detective, Schuller appeared "lucid and normal" during his initial conversations about the case. In subsequent calls

Schuller revealed that he intended to pursue a "mental health defense." After that intent became clear, the detective noticed a difference in how Schuller talked in his conversations. He began speaking "much more" about conspiracy theories, including "law enforcement conspiring against him" and "angels and demons . . . [a]ffecting things in his everyday life."

The prosecution also called two forensic psychologists who had been appointed by the court to evaluate Schuller. The first psychologist opined that defendant was exaggerating or feigning psychiatric distress. The psychologist did not believe Schuller was mentally ill but acknowledged that his extensive drug use could have caused hallucinations. The psychologist testified that Schuller's decision to burn W.T.'s body and then attempt to evade police demonstrated knowledge of wrongdoing and an understanding of consequences.

The second psychologist likewise testified that she believed defendant was "malingering or exaggerating his mental health condition." The psychologist noted that during Schuller's initial recorded jailhouse conversations, he had discussed his case at length but made no mention of any psychiatric symptoms, hallucinations, seeing demons or any of the problems that he later described to the psychologist.

### 2. *Defense's request for instruction on imperfect self-defense*

Prior to closing argument, the defense requested an instruction on voluntary manslaughter based on imperfect self-defense. The prosecution opposed, arguing that Schuller's testimony demonstrated that any alleged belief in the need to defend himself was the result of delusions, and thus amounted to a claim of insanity that could only be raised in the sanity

phase of the trial. (See *People v. Elmore* (2014) 59 Cal.4th 121, 130, 146 (*Elmore*) ["the doctrine of unreasonable self-defense is [not] available when belief in the need to defend oneself is entirely delusional"; such a claim must instead be raised at "a sanity trial"].)

The defense, however, argued that Schuller's imperfect self-defense claim was not based on "purely delusional belief[s]" (*Elmore*, *supra*, 59 Cal.4th at p. 130), but rather was supported by the objective circumstances of the crime scene. Specifically, Schuller had testified that W.T. attempted to attack him with a knife while reaching for a firearm, and a knife and an empty gun case had been recovered from the kitchen table. According to the defense, while Schuller's testimony suggested his reactions to W.T. may have been "distorted by mental illness," there was nonetheless sufficient evidence to support a finding that he mistakenly believed the actual circumstances required him to act in self-defense. (See *id.* at p. 146 ["defendants who mistakenly believed that actual circumstances required their defensive act may argue they are guilty only of voluntary manslaughter, even if their reaction was distorted by mental illness"].)

The trial court ultimately sided with the prosecution, concluding that Schuller's testimony demonstrated his "reaction [to W.T.] was produced by the mental disturbance alone, which is the very thing that the cases talk about as being for the sanity phase, not for the guilt phase." The court acknowledged that a knife was found on the kitchen table but concluded that was insufficient to warrant an instruction on imperfect self-defense. The court did, however, instruct the jury that it could consider evidence of Schuller's mental condition "in deciding whether [he had] acted with deliberation and premeditation."

### 3. *Closing argument and jury verdict*

Because Schuller had admitted that he intentionally shot W.T. in the head and the trial court had denied his request for an instruction on imperfect self-defense, the sole issue contested at closing argument was whether Schuller should be found guilty of premeditated first degree murder or second degree murder.

The prosecution emphasized to the jury that "self-defense was [not] an option . . . in this case" and that there was "no legal self-defense argument that [it could] even consider." The prosecution explained that in light of the absence of any such possible defense, the element of malice had been conclusively established by Schuller's admission that he repeatedly shot W.T. in the head. The prosecution further contended that the manner of the killing and Schuller's subsequent attempts to burn the body and evade the police showed he had acted not only with malice, but also with deliberation and premeditation. Finally, the prosecution discussed how the jury should evaluate the "mental health evidence," noting that multiple psychologists had testified Schuller appeared to be exaggerating his condition as a means to avoid criminal liability.

In response, the defense argued that Schuller's testimony showed he was suffering from a "severe mental health crisis" that had caused him to believe W.T. was "a physical threat . . . and that is why he killed." The defense theorized that Schuller's "delusional state of mind" had led him to believe that "W.T. was allied with forces of darkness" and "react[] to things that weren't there." According to Schuller, this evidence raised at least a reasonable doubt whether his "paranoid beliefs" had caused him

to act out of a perceived fear for his life rather than with deliberation and premeditation.

The jury found Schuller guilty of first degree murder. Following the determination of guilt, the trial proceeded to the sanity phase. The jury was unable to reach a decision on that issue and a second jury was empaneled. The second jury found that Schuller was legally sane at the time of the shooting.

## B. Court of Appeal Proceedings

On appeal, Schuller argued the trial court erred in refusing to instruct on imperfect self-defense because the evidence showed his fear of W.T. was not based purely on delusion. The appellate court agreed, concluding that Schuller's account of the "shooting was not *entirely* delusional." (*Schuller*, *supra*, 72 Cal.App.5th at p. 233.) The court explained that Schuller had testified he feared for his life because W.T. had come at him with a knife and a knife had been found at the scene of the crime.

Having found error, the court next evaluated whether Schuller had suffered prejudice. The parties disputed whether the instructional error amounted to a violation of state law, requiring the court to evaluate prejudice under the "reasonably probable" standard articulated in *Watson, supra,* 46 Cal.2d 818, or a violation of the federal Constitution, requiring prejudice to be evaluated under the "beyond a reasonable doubt" standard set forth in *Chapman, supra,* 386 U.S. 18. While acknowledging some courts had applied the *Chapman* standard to a trial court's failure to instruct on imperfect self-defense (see *People v. Dominguez* (2021) 66 Cal.App.5th 163; *People v. Thomas* (2013) 218 Cal.App.4th 630), the court found that our prior decisions in *Breverman, supra,* 19 Cal.4th 142, and *People v. Gonzalez* (2018)

5 Cal.5th 186 (*Gonzalez*), compelled *Watson* review. The court further concluded, however, that the error was harmless under both the *Watson* and *Chapman* standards.

Schuller filed a petition seeking review of the appellate court's finding that the failure to instruct on imperfect self-defense was not prejudicial.

## II.    DISCUSSION

The sole question presented in this case is whether the trial court's error in declining Schuller's request for an instruction on imperfect self-defense was prejudicial.[2]   To answer this question, we must address two issues.  First, we must decide what standard for evaluating prejudice — *Chapman* or *Watson* — applies to this form of instructional error.  Second, we must assess the Court of Appeal's finding that the error was harmless.

---

[2]   Although the Court of Appeal noted that Schuller's instructional claim raised an apparent issue of first impression — whether imperfect self-defense is available when "a defendant's story is that a real person attacked him, but there are delusional components to the defendant's description of what happened" (*Schuller, supra,* 72 Cal.App.5th at p. 233) — the People did not seek review of the court's finding that it was error to deny an instruction under such circumstances.  Nor have they raised that issue in their briefing before this court.  Accordingly, we have no occasion to evaluate whether Schuller's testimony that W.T. threatened him with a knife was sufficient to support an instruction on imperfect self-defense.  We proceed under the assumption that such an instruction should have been provided.

## A. Does *Watson* or *Chapman* Review Apply?

### 1. *Overview of standards for evaluating prejudice*

"The 'generally applicable California test for harmless error' is set forth in *Watson, supra,* 46 Cal.2d 818. [Citation.] Under the *Watson* test, we deem an error harmless unless it is 'reasonably probable' the outcome would have been different in the absence of the error. [Citation.] As a general matter, this test applies to ' " 'incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error.' " ' [Citation.]

" 'In contrast, we evaluate the harmlessness of violations of the federal Constitution under the standard set forth in *Chapman*[, *supra,* 386 U.S. 18].' [Citation.] This 'stricter' standard of review requires reversal unless the error is 'harmless beyond a reasonable doubt.' [Citation.] Among the constitutional errors subject to *Chapman* review is misinstruction of the jury on one or more elements of the offense. [Citation.] This is because the federal Constitution requires 'criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " (*Hendrix, supra,* 13 Cal.5th at p. 942.) Applying those principles, we have held that *Chapman* review applies to instructional errors that "misdescribe[]" (*Hendrix,* at p. 942) an element of the charged offense or are otherwise "incomplete and misleading" (*Wilkins, supra,* 56 Cal.4th at p. 349) with respect to the findings necessary to prove an element of the offense. (See *People v. Brooks* (2017) 3 Cal.5th 1, 69.) The key inquiry is whether the instruction operated to "preclude[] the jury from making a finding" (*Neder, supra,* 527 U.S. at p. 10) on any fact necessary to establish an element of the offense. (See *Winship, supra,*

397 U.S. at p. 364 [due process requires prosecution to prove "beyond a reasonable doubt . . . every fact necessary to constitute the [charged] crime"].)

Here, Schuller argues that the trial court's denial of a request to instruct on imperfect self-defense operated to misdescribe the malice element of murder, and thus constitutes federal constitutional error. The Attorney General, in contrast, argues that because "the absence of imperfect self-defense is [not] an element of malice murder," the error is one "of state law only." He further contends that our prior decisions have repeatedly held that this form of instructional error amounts to a failure to instruct on a lesser included offense and is thus "governed by *Watson*."

### 2. *Summary of applicable legal principles governing imperfect self-defense*

California law separates criminal homicide into two classes: the greater offense of murder and the lesser offense of manslaughter. (See *Rios*, *supra*, 23 Cal.4th at p. 460.) Murder is defined as "the unlawful killing of a human being . . . with malice aforethought" (§ 187, subd. (a)), while manslaughter is defined as "the unlawful killing of a human being without malice" (§ 192). Thus, the "distinguishing feature [between the two offenses] is that murder includes, but manslaughter lacks, the element of malice." (*Rios*, at p. 460.) Malice exists when "an unlawful homicide was committed with the 'intention unlawfully to take away the life of a fellow creature' (§ 188), or with awareness of the danger and a conscious disregard for life." (*Rios*, at p. 460.)[3]

---

[3] While the Penal Code recognizes these two distinct forms of malice — commonly referred to as express and implied

"Generally, the intent to unlawfully kill constitutes malice." (*Breverman, supra,* 19 Cal.4th at p. 153.) However, California law recognizes two circumstances where "a finding of malice may be precluded, and the offense limited to manslaughter, even when an unlawful homicide *was* committed with intent to kill" (*Rios, supra*, 23 Cal.4th at p. 460): (1) when a person kills " ' "in a 'sudden quarrel or heat of passion' [citation], or . . . [(2) when a person] kills in 'unreasonable self-defense' — the unreasonable but good faith belief in having to act in self-defense [citations]." ' " (*Ibid.*) "These mitigating circumstances reduce an intentional, unlawful killing from murder to voluntary manslaughter 'by *negating* the element of malice that otherwise inheres in such a homicide [citation].' " (*Id.* at p. 461, quoting *Breverman*, at p. 154.) The circumstance at issue in this case, imperfect self-defense, "obviates malice because that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand." (*Rios*, at p. 461; see *Elmore, supra*, 59 Cal.4th at p. 134 [" ' "A person who actually believes in the need for self-defense necessarily believes he is acting lawfully." [Citation.] Because express malice requires an intent to kill unlawfully, a killing in the belief that one is acting lawfully is not malicious' "].) A defendant charged with murder is entitled to an instruction on imperfect self-defense if there is substantial evidence to support the theory. (See *Elmore*, at p. 134; *Breverman, supra,* 19 Cal.4th at p. 162.)

Thus, the relationship between murder and voluntary manslaughter — and more specifically the relationship between

---

malice — in this case Schuller has conceded that he intended to kill the victim but contends he did so in imperfect self-defense.

murder and unreasonable self-defense — is somewhat "unique" in our criminal law. (*Rios*, *supra*, 23 Cal.4th at p 459.) While "closely resembl[ing] an affirmative defense" (*People v. Barton* (1995) 12 Cal.4th 186, 199), imperfect self-defense is "not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter. And voluntary manslaughter . . . is not a defense but a crime . . . ." (*Id.* at p. 200.)

We have previously held that given how California has chosen to structure its homicide laws, when imperfect self-defense is at issue in a murder case, the People must prove the absence of that circumstance "beyond a reasonable doubt . . . in order to establish the . . . element of malice." (*Rios*, *supra*, 23 Cal.4th at p. 462, italics omitted.) The state's duty to disprove imperfect self-defense follows from the high court's decision in *Mullaney v. Wilbur* (1975) 421 U.S. 684 (*Mullaney*), which considered the constitutionality of a Maine homicide law that placed the burden of proving provocation as a means of negating the malice element of murder on the defendant. Maine defined murder as an unlawful killing with malice aforethought and defined malice as an intentional killing in the absence of provocation. It defined manslaughter as an intentional killing without malice. (*Id.* at pp. 684–687, 696–698.) Thus, as in California, the offense of murder in Maine required malice (*id.* at p. 684), with "heat of passion on sudden provocation" (*id.* at p. 703) operating to negate malice and reduce the crime to manslaughter. Maine, however, placed the burden of proving heat of passion on the defendant.

The Supreme Court held that under this statutory scheme, placing the burden of proving heat of passion on the defendant violated "the due process requirement, as defined in [*Winship*, *supra*, 397 U.S. at p. 364], that the prosecution prove

beyond a reasonable doubt every fact necessary to constitute the crime charged." (*Mullaney*, *supra*, 421 U.S. at p. 685.) In its analysis, the court acknowledged that "as a formal matter[,] the absence of the heat of passion on sudden provocation is not a 'fact necessary to constitute the *crime*' of [murder] in Maine." (*Id*. at p. 697.) The court concluded, however, that the rule of *Winship* is "concerned with substance rather than . . . formalism" (*Mullaney*, at p. 699), and because "Maine ha[d] chosen to distinguish those who kill in the heat of passion from those who kill in the absence of this factor" (*id*. at p. 698), due process required the state to prove the absence of heat of passion beyond a reasonable doubt. (See *id*. at p. 704.)

Since *Mullaney* was decided, we have repeatedly cited the decision in support of the proposition that when provocation or imperfect self-defense are at issue, the prosecution is compelled to disprove those circumstances beyond a reasonable doubt. (See *Rios*, *supra,* 23 Cal.4th at p. 462; *People v. Bloyd* (1987) 43 Cal.3d 333, 349; cf. *Smith v. United States* (2013) 568 U.S. 106, 110 (*Smith*).) California's standard jury instructions on voluntary manslaughter include this requirement. (CALCRIM Nos. 570, 571.)

### 3. *The instructional error qualifies as a violation of the federal Constitution*

Although our standard instructions do not suffer the same defect at issue in *Mullaney,* we agree with Schuller that the high court's holding bears equally on the error at issue here — a *failure to instruct* on these theories when substantial evidence supports them. Given how California has chosen to structure the relationship between murder and voluntary manslaughter, a trial court's failure to instruct on imperfect self-defense amounts to an incomplete instruction on the malice element of

murder and is therefore subject to *Chapman* review for constitutional error. (See *Wilkins, supra,* 56 Cal.4th at p. 349 [*Chapman* review applies to "incomplete" or "misleading" instruction on element of the crime].)

As explained above, the high court's holding in *Mullaney* makes clear that when substantial evidence of imperfect self-defense is present, the malice element of murder requires the People to prove beyond a reasonable doubt not only that the defendant committed an unlawful, intentional killing, but also that the defendant did not kill in an actual but unreasonable belief in the need for self-defense. (See *Mullaney, supra,* 421 U.S. at p. 704 ["the Due Process Clause requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case"]; see also *Rios, supra,* 23 Cal.4th at p. 462 ["If the issue of provocation or imperfect self-defense is . . . 'properly presented' in a murder case [citation], the People must prove beyond reasonable doubt that these circumstances were lacking in order to establish the murder element of malice" (italics omitted)]; *ante,* at pp. 15–18.) Stated more simply, because malice is absent when imperfect self-defense is present, the prosecution cannot prove malice without disproving imperfect self-defense.[4] (See *Rios,* at p. 461 [evidence of imperfect self-defense "is relevant . . . to determine whether malice has been established, thus allowing a conviction

---

[4] These rules of course apply only when imperfect self-defense is at issue. If a person has been charged with murder and there is no evidence that would support a finding of imperfect self-defense, the question of imperfect self-defense is not part of the malice inquiry. (See generally *Rios, supra,* 23 Cal.4th at pp. 461–462.)

of murder, or has not been established, thus . . . limiting the crime to . . . voluntary manslaughter" (italics omitted)].)

Without an instruction on imperfect self-defense, the jurors in this case were never informed that if they harbored a reasonable doubt whether Schuller was operating under an actual but unreasonable belief in the need for self-defense, they were required to acquit him of murder for lack of malice. (Cf. *Wilkins*, *supra*, 56 Cal.4th at p. 348 [applying *Chapman* review where the trial court failed to instruct jury that the continuous transaction element of felony murder was absent if the defendant "had reached a place of temporary safety before the fatal act occurred"].) Indeed, the record demonstrates that at closing argument the prosecution told the jury the element of malice had been conclusively established because Schuller admitted he intentionally shot the victim and had failed to proffer any legally valid theory of self-defense. Schuller, in turn, was unable to argue to the jury that he lacked the requisite malice to have committed murder, arguing only that his perceptions of W.T.'s conduct raised a reasonable doubt as to whether the killing was committed with deliberation and premeditation. In other words, the lack of instruction forced Schuller to concede, and enabled the prosecution to affirmatively argue, that Schuller's belief in the need to defend himself was entirely *immaterial* to the jury's determination of malice. Thus, on the record before us, it is clear the trial court's misinstruction precluded the jury from making a factual finding — the absence of imperfect self-defense beyond a reasonable doubt — that was necessary to prove an "actual element" of the charged offense of murder — malice. (*Neder*, *supra,* 527 U.S. at p. 10, italics omitted.) *Chapman* review is therefore appropriate.

The Court of Appeal reached a different conclusion, reasoning that whatever merit there might be in Schuller's theory of federal constitutional error, two prior decisions of this court — *Breverman*, *supra*, 19 Cal.4th 142, and *Gonzalez*, *supra*, 5 Cal.5th 186 — have held that this form of instructional error amounts to a violation of state law only. The Attorney General presents a similar argument, contending that "[t]hese authorities strongly suggest that the issue in this case is settled." We disagree.

In *Breverman*, *supra*, 19 Cal.4th 142, we held that manslaughter qualifies as a lesser included offense of murder, and thus a trial court has a sua sponte duty to instruct on heat of passion and imperfect self-defense when the evidence raises a question as to those issues. (See *id.* at pp. 153–155.) However, we rejected the defendant's assertion that a trial court's failure to instruct on those issues qualifies as a violation of the federal Constitution. (*Id.* at p. 165.) Noting that the high court had never "recogniz[ed] a federal constitutional right to instructions on lesser included offenses in noncapital cases" (*ibid.*), we held that "the rule requiring sua sponte instructions on all lesser necessarily included offenses supported by the evidence derives exclusively from California law" (*id.* at p. 169). Thus, any violation of that duty was subject to review under *Watson's* reasonable probability standard.

Notably, however, in a dissenting opinion that directly tracks the argument Schuller presents here, Justice Kennard argued the instructional error amounted to a violation of the federal Constitution. (See *Breverman*, *supra*, 19 Cal.4th at p. 190 (dis. opn. of Kennard, J.) ["murder instructions that fail to inform the jury it may not find the defendant guilty of murder if heat of passion is present are incomplete instructions on the

element of malice"].)  In a responding footnote, the majority explained that it need not address whether the misinstruction had "caused the definition of the malice element of murder . . . to be incomplete" (*id.* at p. 170, fn. 19, italics omitted) because the defendant never raised that specific argument.  The majority concluded that the "merits" of such a theory should "await a case in which they have been clearly raised and fully briefed."  (*Ibid.*; see *People v. Moye* (2009) 47 Cal.4th 537, 558, fn. 5 [declining to address whether failure to instruct on provocation resulted in incomplete definition of malice because the defendant had not raised that theory]; *Lasko*, *supra*, 23 Cal.4th at p. 113 [acknowledging that the *Breverman* majority had "declined to consider whether [failure to instruct on provocation] violated the federal Constitution by giving the jury an incomplete definition of malice, an element of murder"].)  Having specifically preserved consideration of the theory of constitutional error that Schuller raises here, *Breverman* cannot be said to preclude those arguments.

In *Gonzalez*, *supra*, 5 Cal.5th 186, we addressed whether the trial court's failure to instruct on second degree murder (and various other lesser forms of homicide) in a felony murder case had been rendered harmless by the jury's true finding on a special circumstance allegation that the murder was committed during a robbery.  In deciding that question, we applied *Breverman's* rule that "[t]he failure to instruct on lesser included offenses supported by substantial evidence [is] state law error."  (*Gonzalez*, at p. 196.)  We did not address, nor did the defendant raise, the theory of federal constitutional error that Justice Kennard discussed (and that the majority left open) in *Breverman*.  Indeed, it does not appear that theory would have had any relevance to the type of error at issue in *Gonzalez*

22

because the omitted instructions in that case — lesser forms of homicide — did not operate to negate or otherwise modify the elements of the charged offense of felony murder, which does not require a showing of malice. (See *People v. Dillon* (1983) 34 Cal.3d 441, 475 ["malice is not an element of felony murder"].) Accordingly, we find nothing in *Gonzalez* that forecloses us from finally addressing the theory of error that Schuller raises here.

The People argue that even if *Breverman* and *Gonzalez* do not foreclose us from considering Schuller's argument regarding constitutional error, we should nevertheless reject that argument on the merits. While acknowledging that *Chapman* review applies to a trial court's failure to properly instruct on an element of the charged offense, the Attorney General contends the absence of imperfect self-defense is not an element of murder, but rather amounts only to "an exculpatory theory . . . similar to a defense." (See, e.g., *People v. Martinez* (2003) 31 Cal.4th 673, 685 [for purposes of deciding whether foreign conviction satisfies prior murder special circumstance (see § 190.2, subd. (a)(2)), the absence of imperfect self-defense does not qualify as an element of murder].) Thus, the Attorney General reasons, cases applying *Chapman* review to instructions that relate to an element of the offense are inapplicable.

The Attorney General overlooks that *Chapman* review applies not only to instructions that omit an element of the offense, but also to instructions that provide an incomplete or misleading description of what is necessary to establish an element of the offense. (See *Hendrix, supra,* 13 Cal.5th at p. 942; *Wilkins, supra,* 56 Cal.4th at p. 349.) And as discussed above, it is well established that when imperfect self-defense is

at issue, the prosecution cannot establish malice without proving the absence of that circumstance beyond a reasonable doubt. Because of that requirement, without an instruction on imperfect self-defense, the jury is left unable to properly evaluate whether the prosecution has sustained its burden to prove malice. More specifically, the jury is left unaware that even if the prosecution has proven that the defendant intended to kill — a circumstance that generally demonstrates express malice — the jury cannot find malice if it has a reasonable doubt whether the defendant killed in imperfect self-defense. Thus, the failure to instruct on that issue rendered the description of *malice* —which is unquestionably an element of murder — incomplete.

Finally, the Attorney General disagrees with our conclusion that under *Mullaney*, *supra*, 421 U.S. 684, the State has a constitutional duty to disprove imperfect self-defense beyond a reasonable doubt when that theory is presented in a murder case. (See *ante*, at pp. 17–18.) He contends that two subsequent high court decisions, *Patterson v. New York* (1977) 432 U.S. 197 (*Patterson*) and *Engle v. Isaac* (1982) 456 U.S. 107 (*Engle*), have clarified that while states may choose to "task[] the prosecution with proving [the] absence [of imperfect self-defense] beyond a reasonable doubt," they nonetheless retain the authority to allocate the burden of proof on that issue to the defendant. In the Attorney General's view, because these cases show California is not constitutionally required to disprove imperfect self-defense, any error associated with failing to instruct on that theory is necessarily grounded in state law and thus subject to *Watson* review.

Contrary to the Attorney General's assertions, nothing in *Patterson*, *supra*, 432 U.S. 197, or *Engle*, *supra*, 456 U.S. 107,

24

supplants *Mullaney's* rule that when a state chooses to recognize a defensive theory that *operates to negate an element of the charged offense*, and the defendant presents evidence placing that theory at issue, the due process clause requires the state to prove the absence of that circumstance beyond a reasonable doubt.  (See *Mullaney*, *supra*, 421 U.S. at p. 704; *Smith*, *supra*, 568 U.S. at p. 110 [when a defensive theory " 'negate[s] an element of the crime'. . . the Government has [a] constitutional duty to overcome the defense beyond a reasonable doubt"].)

In *Patterson*, *supra*, 432 U.S. 197, the court held only that the principles of *Mullaney* do not require states to "disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused." (*Patterson*, at p. 210.)  *Patterson* involved a New York law that defined murder differently from California.  The New York law defined the crime of murder as "causing the death of another person with intent to do so."  (*Id.* at p. 205.)  Thus, unlike California or Maine, the New York law crucially did not define murder by using the term "malice."  Instead, the sole elements of the offense were the death of a person, the intent to kill and causation.  New York also provided an affirmative defense of "extreme emotional disturbance" that, if proved by the defendant by a preponderance of the evidence, would reduce the crime to manslaughter.

In upholding the constitutionality of this legal structure, the court noted that unlike the homicide laws at issue in *Mullaney*, New York's emotional disturbance defense did "not serve to negative any facts of the crime which the State is to prove in order to convict of murder" (*Patterson*, *supra*, 432 U.S. at p. 207), but rather related to "a separate issue" (*ibid*.) distinct from the elements of the offense.  Thus, *Patterson* merely stands

for the proposition that states are permitted to place the burden of proving some forms of affirmative defenses on the defendant, namely those that do not serve to "negative any facts" (*ibid.*) necessary to prove the charged offense.

In *Engle, supra,* 456 U.S. 107, habeas petitioners raised multiple arguments challenging the constitutionality of a state law that shifted the burden of proving self-defense to defendants. In the section of the decision the Attorney General cites, the court reiterated *Patterson's* holding that states are constitutionally permitted to assign defendants the burden of proving some forms of affirmative defenses. (*Engle,* at p. 121.) However, in a separate section of the decision that the Attorney General does not discuss, the *Engle* court evaluated petitioners' alternative contention that because the homicide offenses they had been charged with required a showing of "purposeful or knowing behavior" (*id.* at p. 121), the presence of self-defense served to "negate" (*ibid.*) an element of the crime, thus requiring the State to "disprove that defense as part of its task of establishing guilty *mens rea* . . . ." (*Id.* at p. 122.) Noting that several federal and state courts had interpreted *Mullaney* and *Patterson* as creating a constitutional duty to "prove absence of self-defense if that defense negates an element . . . of the charged crime" (*Engle,* at p. 122), the court found that the petitioners' argument stated a "colorable constitutional claim." (*Ibid.*) The court went on to conclude, however, that for purposes of federal habeas relief, petitioners had procedurally defaulted this claim by failing to raise it in the state court proceedings. As a result, the court declined to address the claim on the merits.

More recently, in *Smith, supra,* 568 U.S. 106, the high court adopted the argument left unaddressed in *Engle,*

clarifying that under the *Mullaney/Patterson* framework, "[t]he State is foreclosed from shifting the burden of proof to the defendant . . . 'when an affirmative defense . . . negate[s] an element of the crime.' [Citation.] Where instead it 'excuse[s] conduct that would otherwise be punishable,' but 'does not controvert any of the elements of the offense itself,' the Government has no constitutional duty to overcome the defense beyond a reasonable doubt." (*Smith*, at p. 110; cf. *People v. Thomas* (2023) 14 Cal.5th 327, 384 [*Mullaney's* principles are inapplicable to provocation in the context of first degree murder because provocation is merely a factor the jury can consider when evaluating premeditation and deliberation].) *Smith* thus reaffirms that because California has structured its homicide laws so that imperfect self-defense operates to negate the element of malice, the State is *constitutionally required* to disprove such a theory in cases where the issue is presented.[5]

---

[5] The People argue that language in *People v. Babbitt* (1988) 45 Cal.3d 660 (*Babbitt*), supports the view that the prosecution does not have a constitutional duty to disprove defensive theories that negate an element of the crime. The defendant in *Babbitt* argued that an instruction on the affirmative defense of unconsciousness violated the due process clause by placing the burden of proof on that issue on the defense. The defendant posited that because unconsciousness operated to negate intent, the People could not shift the burden of proof on that issue, but instead were required to prove the absence of that circumstance beyond a reasonable doubt.

While *Babbitt* contains language that could be read to suggest the People are not constitutionally required to disprove defensive theories that negate an element of the crime (see *Babbitt*, *supra*, 45 Cal.3d at pp. 693–694), we ultimately held that the challenged instructions did not shift the burden on the question of unconsciousness and therefore did not implicate the constitutional issues addressed in *Mullaney* and *Patterson*.

In sum, while states retain flexibility in choosing how to define criminal offenses, our high court's decisions make clear that if a state chooses to recognize a defensive theory that operates to negate an element of the charged offense, the due process clause requires the prosecution to prove the absence of that circumstance beyond a reasonable doubt.[6]  Applying those principles here, we hold that when there is substantial evidence of imperfect self-defense in a murder case, the trial court's failure to instruct on that theory precludes the jury from making a factual finding that is necessary to prove the malice element of murder.  The error therefore amounts to a violation of the federal Constitution and is subject to *Chapman's* "beyond a reasonable doubt" standard for evaluating prejudice.

We emphasize that our conclusion is predicated on the "unique" relationship between murder and voluntary

---

Moreover, *Babbitt* was decided before *Smith, supra,* 568 U.S. 106, and *Rios, supra,* 23 Cal.4th 450, which make clear that because imperfect self-defense negates the malice element of murder, the People have a constitutional duty to prove the absence of that circumstance beyond a reasonable doubt. (*Rios,* at p. 462; *Smith,* at p. 110.)

[6]     As our high court has acknowledged, under the approach adopted in the *Mullaney* and *Patterson* line of cases, "the prosecution's constitutional duty to negate affirmative defenses may depend, at least in part, on the manner in which the State defines the charged crime." (*Engle, supra,* 456 U.S. at p. 120.) While the court's due process jurisprudence in this area does appear to allow states considerable flexibility in defining offenses in such a way as to reallocate the burden of proving certain defensive issues (see *Patterson, supra,* 432 U.S. at p. 210), those cases nonetheless make clear the structure California has adopted with respect to homicide trigger a constitutional duty to disprove imperfect self-defense beyond a reasonable doubt.

manslaughter (see *ante*, at pp. 15–18), and does not otherwise modify the general rule that the failure to instruct on other forms of lesser included offenses in noncapital cases is an error of state law. (See *Breverman*, *supra*, 19 Cal.4th at p. 165.)[7] We also express no opinion on the appropriate standard of review for instructional errors related to other forms of defensive theories, including affirmative defenses. (See *Gonzalez*, *supra*, 5 Cal.5th at p. 199 [this court "ha[s] yet to determine whether a trial court's failure to instruct on a requested affirmative defense instruction supported by substantial evidence is federal constitutional error or state law error"]; cf. *People v. Rogers* (2006) 39 Cal.4th 826, 872 [discussing federal authorities concluding that trial court's failure to give a requested instruction embodying the defense's theory of the case "violate[s] the defendant's due process right to present a complete defense"].)

---

[7]     Our holding does of course apply to other forms of *voluntary manslaughter*, i.e., heat of passion and imperfect defense of others, which operate identically to imperfect self-defense by negating the malice element of murder. (See *Rios, supra*, 23 Cal.4th at p. 461; *People v. Randle* (2005) 35 Cal.4th 987, 997 [as with imperfect self-defense, one who kills in imperfect defense of others is "guilty of manslaughter, not murder, because he lacks the malice required for murder" (italics omitted)].) Thus, when the record contains substantial evidence of heat of passion or imperfect defense of others, the failure to instruct on those theories is likewise subject to review under the *Chapman* standard. We disapprove *People v. Breverman, supra*, 19 Cal.4th 162, and *People v. Randle, supra*, 35 Cal.4th 987, to the extent those cases could be read to hold otherwise.

## B. The Court of Appeal's Prejudice Analysis Did Not Comport with *Chapman*

Having concluded that the trial court's misinstruction (or more precisely the court's assumed misinstruction, see *ante*, at p. 13, fn. 2) qualified as a violation of the federal Constitution, we must next assess the Court of Appeal's conclusion that the error was harmless. Although the court found that the misinstruction amounted to an error of state law only (a conclusion we have now rejected), it went on to hold that the error was harmless even under *Chapman's* stricter standard for constitutional violations, which requires reversal unless it appears " 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*People v. Brown* (2023) 14 Cal.5th 453, 473.)

Our recent decision in *Lopez, supra*, 14 Cal.5th 562, clarified the *Chapman* standard in the context of instructional errors that " 'misdescri[be] . . . the elements' " of the charged offense. (*Lopez*, at p. 568.) We explained that the "test is exacting" (*id*. at p. 581), requiring reversal unless the reviewing court is persuaded that " ' "[n]o reasonable jury" ' " would have found in favor of the defendant on the missing fact, given the jury's actual verdict and the state of the evidence" (*id*. at p. 580). When making this evaluation, the reviewing court " 'does not . . . "become in effect a second jury to determine whether the defendant is guilty." [Citation.] Rather a court, in typical appellate-court fashion, asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.' " (*Id*. at p. 581.) As stated by our high court, "safeguarding the jury guarantee will often require that a reviewing court conduct a thorough examination of the record. If, at the end of that examination, the court cannot

conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error — for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding — it should not find the error harmless." (*Neder, supra,* 527 U.S. at p. 19.)

In this case, the Court of Appeal's harmless error analysis focused solely on what it characterized as "overwhelming evidence that [Schuller] was not acting in any form of self-defense." (*Schuller, supra,* 72 Cal.App.5th at p. 238.) In the court's view, several categories of evidence "undercut [Schuller's] claim of self-defense" (*id.* at p. 239) or "did not entirely align with his story" (*id.* at p. 240), including (among other things): (1) "[his] account of the killing radically changed leading up to trial" (*id.* at p. 238); (2) two psychologists testified that Schuller appeared to be malingering (*id.* at p. 239); (3) his conduct immediately after the killing (setting fire to the body, shooting the victim's phone and fleeing from the scene) belied his claim that he had tried to contact police (*id.* at pp. 239–240); (4) many "aspects of [Schuller's] testimony" were inconsistent, thereby "undercut[ting] his credibility" (*id.* at p. 239); (5) the physical evidence at the scene of the crime did not support Schuller's claim, in particular the fact that the knife was found "on the table — not on the floor . . . [a]nd unlike the surrounding area, . . . had no blood on it" (*id.* at p. 239); and (6) Schuller shot the victim nine times in the head, suggesting "a personal motive, rather than panicked self-defense" (*id.* at p. 240). The court believed that, considered together, this evidence showed "there was no reasonable possibility the error contributed to the verdict." (*Ibid.*)

The court's discussion suggests that rather than assess whether any reasonable jury could have credited Schuller's

31

claim of imperfect self-defense "given the . . . actual verdict and the state of the evidence" (*Lopez, supra*, 14 Cal.5th at p. 580), the court performed its own weighing of the evidence and its own assessment of witness credibility. It was not the court's role, for example, to decide whether Schuller's failure to raise the issue of self-defense in his initial conversations with police demonstrated that his trial testimony was not true or credit the psychologists' disputed conclusion that Schuller was malingering. While much of the trial evidence certainly casts doubt on Schuller's claim of imperfect self-defense, it was ultimately the jury's role, not that of the reviewing court, to assess whether such evidence showed beyond a reasonable doubt that Schuller did not "kill[] with an actual but unreasonable belief in the need for self-defense against imminent death or great bodily injury." (*In re Christian* S. (1994) 7 Cal.4th 768, 778.)

The court's findings on the merits of Schuller's instructional claim — i.e., that he was entitled to an instruction on imperfect self-defense — further confirm that the court's evaluation of prejudice did not comport with the standards of *Chapman*. When assessing the merits of Schuller's claim, the court correctly explained that an instruction on imperfect self-defense must be given when there is "substantial evidence" to support such a theory. (*Schuller, supra*, 72 Cal.App.5th at p. 231; see *Breverman, supra*, 19 Cal.4th at p. 162.) It further observed — again correctly — that "substantial evidence [in this context] is ' " 'evidence from which a jury composed of reasonable [persons] could' " ' " find in the defendant's favor on the issue. (*Schuller*, at p. 231; see *Breverman*, at p. 162.) Applying those standards, the court found that the record *did* contain sufficient evidence to require an instruction on

imperfect self-defense, citing Schuller's testimony that W.T. had threatened him with a knife and citing evidence demonstrating that a knife was found at the scene of the crime. (*Schuller*, at p. 236.) Despite that finding, the court went on to conclude that the instructional error was harmless because the evidence weighing against Schuller's claim of imperfect self-defense was "overwhelming." (*Id.* at p. 238.)

Had the court properly applied the standards required under *Chapman*, it could not have found both that Schuller presented sufficient evidence to support an instruction on imperfect self-defense *and* that the error was harmless based solely on the conclusion that the evidence was so overwhelming as to compel a finding against him on that theory. (See *Neder*, *supra*, 527 U.S. at p. 9.) In other words, if the court believed an instruction was warranted because there was sufficient evidence from which a reasonable jury could find in Schuller's favor on the question of imperfect self-defense, the court could not then, consistent with *Chapman*, go on to find that the error was nonetheless harmless simply because the evidence against imperfect self-defense was so overwhelming that no reasonable jury could have possibly found in Schuller's favor on that issue. (See *ibid*.)[8]

---

[8]     In *Breverman*, we rejected the defendant's argument that "an erroneous failure to instruct on a lesser included offense is *necessarily* prejudicial, on the premise that if the evidence was substantial enough to warrant lesser offense instructions in the first place, it must have been strong enough to affect the outcome had the instructions not been omitted." (*Breverman*, *supra*, 19 Cal.4th at p. 177.) We explained that the "standard[] of evidentiary review" used to evaluate whether an instruction on a lesser included offense should have been provided is "distinct" from the standard of "[a]ppellate review under

Because the Court of Appeal's harmless error analysis demonstrates that it misapprehended the standard that *Chapman* requires, we remand the matter to allow the court to reconsider whether the failure to instruct on self-defense was harmless beyond a reasonable doubt under the appropriate standard. (See *Lopez, supra*, 14 Cal.5th at pp. 580–592 [clarifying *Chapman* standard and remanding question of prejudice where the reviewing court's analysis indicated it "misapprehended" the appropriate standard]; cf. *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 15, [where the Court of Appeal applied an erroneous standard, "regard for the structure of appellate decisionmaking suggests the case should be returned to the Court of Appeal"].)[9]

---

*Watson*." (*Ibid*.) That analysis, however, involved an application of the *Watson* harmless error standard. (*Ibid*.) It does not apply to the higher standard of prejudice applicable under *Chapman* review.

[9] The Attorney General argues that even if the Court of Appeal's approach to evaluating prejudice did not comport with *Chapman*, there is nonetheless a separate basis to support a finding of harmlessness: the jury's "first degree murder verdict, and rejection of second degree murder, shows that the jury necessarily rejected Schuller's testimony that he acted in self-defense, leaving no doubt the jury would have returned the same verdict had it been instructed regarding imperfect self-defense." In support, the Attorney General cites *People v. Manriquez* (2005) 37 Cal.4th 547. (See *id.* at p. 582 [jury's first degree murder verdict "le[ft] no doubt the jury would have returned the same verdict had it been instructed regarding imperfect self-defense"].) The defendant and the concurrence disagree, arguing that the first degree murder finding does not render the instructional error harmless because "the requirements of self-defense are consistent with a killing undertaken with premeditation and deliberation." (Conc. opn. of Liu, J., *post*, at p. 2, citing CALCRIM No. 571.)

## III.   CONCLUSION

The judgment is reversed and the matter is remanded for further proceedings consistent with this opinion.


                                         **GROBAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**JENKINS, J.**
**EVANS, J.**

---

The Attorney General did not rely on this alternative theory below and the Court of Appeal did not address it.  (See *People v. Maya* (2020) 9 Cal.5th 239, 243 [declining to address "alternative ground" raised in support of the judgment and remanding to allow the Court of Appeal to "consider [the issue] in the first instance"]; *Central Coast Forest Assn. v. Fish & Game Com.* (2017) 2 Cal.5th 594, 606 ["it is appropriate to remand . . . for the Court of Appeal to consider . . . unresolved issues in the first instance"].)

PEOPLE v. SCHULLER

S272237


Concurring Opinion by Justice Liu


I agree that "when the record contains substantial evidence of imperfect self-defense, the trial court's failure to instruct on that theory amounts to constitutional error and is thus subject to review under the federal *Chapman* standard." (Maj. opn., *ante*, at p. 2; see *Chapman v. California* (1967) 386 U.S. 18, 24.) I further agree that where the Court of Appeal "believed an instruction was warranted because there was sufficient evidence from which a reasonable jury could find in Schuller's favor on the question of imperfect self-defense" (maj. opn., *ante*, at p. 33), the court could not then "perform[] its own weighing of the evidence" to hold such error harmless (*id.* at p. 32). I write separately to address two issues.

First, while I agree with today's opinion as far as it goes, I would hold that reversible error occurred here. The Court of Appeal determined that instructional error occurred; the Attorney General does not challenge that determination; and our clarification that *Chapman* review applies does not implicate it. (Maj. opn., *ante*, at pp. 1, 13, fn. 2.) The Court of Appeal "could not have found both that Schuller presented sufficient evidence to support an instruction on imperfect self-defense *and* that the [instructional] error was harmless based solely on the conclusion that the evidence was so overwhelming as to compel a finding against him on that theory." (*Id.* at p. 33.) Because the Court of Appeal found the former, and because our decision presents no grounds to disturb that finding, logic

1

dictates that the error cannot be held harmless based on the weight of the evidence.

This conclusion comports with our precedent. In evaluating the harmlessness of an instructional error under *Chapman*, a court is limited to determining whether "it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdict without also finding the missing fact as well." (*In re Lopez* (2023) 14 Cal.5th 562, 568.) Unless the jury's findings in this case precluded any possibility of also finding that Schuller acted in imperfect self-defense, the instructional error cannot be held harmless.

Because the jury's findings that Schuller acted with premeditation and deliberation do not preclude a finding that he honestly but unreasonably believed he needed to act in self-defense, the instructional error is not harmless. While voluntary manslaughter based on heat of passion is "manifestly inconsistent" with premeditation and deliberation (*People v. Wharton* (1991) 53 Cal.3d 522, 572), voluntary manslaughter based on imperfect self-defense is not. Imperfect self-defense does not require a rash or impulsive killing. Rather, the requirements of self-defense are consistent with a killing undertaken with premeditation and deliberation. A defendant who acts in self-defense must honestly believe that he or she is "in imminent danger of being killed or suffering great bodily injury" and that "the immediate use of deadly force [is] necessary to defend against the danger." (CALCRIM No. 571.) These requirements imply that a defendant has evaluated both the danger present and alternate options for escape or de-escalation and has concluded that " 'imminent danger to life or great bodily injury' " requires the use of deadly force. (*People v. Trujeque* (2015) 61 Cal.4th 227, 270, italics omitted.)

Schuller's self-defense claim aligns with these requirements. He testified that after unsuccessfully attempting to flee W.T.'s apartment and then seeing W.T. reach for a gun and attempt to attack with a knife, he determined that responding with deadly force was necessary. (Maj. opn., *ante*, at p. 10.) Schuller's testimony supports a conclusion that he premeditated — that is, he "decided to kill before completing the act[] that caused death," a decision that "can be reached quickly" — and that he deliberated by "carefully weigh[ing] the considerations for and against" his decision to kill. (CALCRIM No. 521.) A juror who credited his testimony could rationally conclude both that he acted with premeditation and deliberation *and* that he honestly though unreasonably believed he needed to act in self-defense. Because the instructional error in this case did not allow a juror to express both of those conclusions, it cannot be found harmless.

Second, if Schuller's conviction is reversed, a new trial is likely to again raise the question of whether his belief in the need for self-defense was "entirely delusional" or was instead supported by an "objective correlate." (*People v. Elmore* (2014) 59 Cal.4th 121, 137 (*Elmore*).) I continue to disagree with our determination in *Elmore*, a closely divided decision, that a defendant may not argue imperfect self-defense based on a "purely delusional belief in the need to act in self-defense." (*Id.* at p. 130; see *id.* at p. 154 (conc. & dis. opn. of Kennard, J., joined by Werdegar & Liu, JJ.).)

*Elmore* held that "unreasonable self-defense is 'a species of mistake of fact . . . predicated upon a negligent perception of facts, not, as in the case of a delusion, a perception of facts not grounded in reality.'" (*Elmore*, *supra*, 59 Cal.4th at p. 136.) Defendants may argue imperfect self-defense where an objective

correlate — that is, evidence demonstrating "a motivation arising from objective facts, not delusions" (*id.* at p. 138) — supports their "mistaken[] belie[f] that actual circumstances required their defensive act" (*id.* at p. 146). By contrast, *Elmore* said, "[a] claim of self-defense based solely on delusion is . . . a claim of legal insanity" and is therefore "reserved for the [trial's] sanity phase." (*Id.* at p. 145.)

But there is no reason to preclude a claim of imperfect self-defense because of the origin of a defendant's honest belief. Because "California has structured its homicide laws so that imperfect self-defense operates to negate the element of malice" (maj. opn., *ante*, at p. 27), "that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand" (*People v. Rios* (2000) 23 Cal.4th 450, 461). As discussed above, self-defense requires a defendant to genuinely believe that he or she is "in imminent danger of being killed or suffering great bodily injury" and that "the immediate use of deadly force [is] necessary to defend against the danger." (CALCRIM No. 571.) But because a "purely delusional" belief in the need for self-defense may be just as genuine as a belief based on an "objective correlate," it is not clear what supports *Elmore*'s conclusion that a defendant's claim of imperfect self-defense must be grounded in objective reality. Such an assessment goes to the reasonableness of a defendant's belief — a consideration necessary to perfect self-defense but irrelevant to imperfect self-defense, which is by definition unreasonable. (*Elmore*, *supra*, 59 Cal.4th at pp. 133–134.)

Moreover, this case demonstrates that *Elmore*'s holding requires highly subjective line drawing. Under *Elmore*, "[a] person who sees a stick and thinks it is a snake" is entitled to

assert imperfect self-defense, but someone "who sees a snake where there is nothing snakelike" is not. (*Elmore, supra*, 59 Cal.4th at p. 137.) This distinction, in addition to lacking a principled basis in the law of murder, comes with no guidance for determining what qualifies as an "objective correlate." Here, the Court of Appeal held that the "large knife . . . found on the kitchen table" and the "gun case . . . on the table" provided objective correlates sufficient to conclude that Schuller's belief was not purely delusional. (*People v. Schuller* (2021) 72 Cal.App.5th 221, 236.) But would the mere presence of a knife in the same room as Schuller have been sufficient, even if Schuller only imagined that W.T. lunged for it? What if W.T. had looked at the knife in a way that Schuller interpreted as presaging an imminent attack? What if W.T. had walked toward the side of the kitchen where the knife was located, and Schuller honestly believed W.T. was going to grab the knife and attack?

There are no easy answers to such questions, yet courts applying *Elmore* must answer them. (See, e.g., *People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1409–1410 [defendant's uncorroborated testimony that he saw victim pull a metallic object from his waistband provided a sufficient objective correlate to necessitate an imperfect self-defense instruction]; *People v. Leeds* (2015) 240 Cal.App.4th 822, 833 [father's kicking down of office door provided an objective correlate for defendant's fatal shooting despite defendant's fear resulting from delusional beliefs about father].) *Elmore* foists on trial courts and juries "[t]he unenviable task of distinguishing such partly delusional beliefs having some objective basis from those that are 'purely' or 'entirely' delusional." (*Elmore, supra*, 59 Cal.4th at p. 152 (conc. & dis. opn. of Kennard, J.).) This

unguided inquiry is compounded by the equally subjective challenge of determining, in the chain of events leading a defendant to have an unreasonable belief in the need for self-defense, at what temporal or causal point an objective correlate must be found.

All of this is unnecessarily confusing and complicated. Requiring an "objective correlate" in order to assert imperfect self-defense is inconsistent with the requirement of malice to prove murder. Because "[t]he unreasonable belief in the need for self-defense may stem from mental illness, negligence, subaverage intelligence, or a variety of other causes . . . [,] it should not matter *why* the killer perceived a need for self-defense." (*Elmore, supra,* 59 Cal.4th at p. 150 (conc. & dis. opn. of Kennard, J.).) Where substantial evidence supports an imperfect self-defense instruction, "the jury at the guilt phase need not decide whether [a defendant's] belief was delusional, but [need] only decide[] whether that belief was genuine." (*Id.* at p. 152 (conc. & dis. opn. of Kennard, J.).) I suggest we reconsider *Elmore* in an appropriate case.

LIU, J.

**I Concur:**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Schuller

_____

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 72 Cal.App.5th 221
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S272237
**Date Filed:**  August 17, 2023

_____

**Court:**  Superior
**County:**  Nevada
**Judge:**  Candace S. Heidelberger

_____

**Counsel:**

David L. Polsky, under appointment by the Supreme Court, for Defendant and Appellant.

Mary K. McComb, State Public Defender, Anne W. Lackey and William Whaley, Deputy State Public Defenders, and Jessie Peterson for the Office of the State Public Defender as Amicus Curiae on behalf of Defendant and Appellant.

Kamala Harris, Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Ivan P. Marrs, Christopher J. Rench, Eric L. Christoffersen, Jennifer M. Poe, Daniel B. Bernstein and Peter H. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David L. Polsky
Attorney at Law
P.O. Box 118
Ashford, CT 06278
(860) 429-5556

Jennifer M. Poe
Deputy Attorney General
1300 I Street
Sacramento, CA 95814
(916) 210-7692